2002 OK CIV APP 62

**In the Matter of A.C., J.C., J.C., W.W., and W.R., alleged deprived children.**

**Wesley and Linda Cox, parents, Appellants,**

v.

**State of Oklahoma, Appellee.**

**No. 95,272.**

Court of Civil Appeals of Oklahoma, Division No. 3.

April 19, 2002.

**124**

Z. Joseph Young, Chickasha, Oklahoma, for appellant.

Robert W. Beal, Assistant District Attorney, Jason Glidewell (Intern), Chickasha, Oklahoma, for appellee.

## OPINION

ADAMS, J.

¶ 1 This is an appeal from a trial court order finding the children who are the subjects of this action to be deprived. For reversal, the appellants (Parents) argue that the State produced insufficient evidence to establish that fact. After reviewing the evidence, we agree and reverse the trial court order.

¶ 2 For purposes of the appeal at least, we assume the State's burden of proof in deprived adjudication proceedings to be "by a preponderance of the evidence." *See Matter of A.D.W.*, 2000 OK CIV APP 110, 12 P.3d 972.[1] Our task on appellate review is to determine whether the record contains any competent evidence reasonably tending to support the trial court's decision, *i.e.*, that the State met its burden of proof. *See Matter of J.M.*, 1993 OK CIV APP 121, 858 P.2d 118.

¶ 3 The State based its claim that the children were deprived on two allegations of fact, both of which the trial court found in its order had been established as true. First, the State claimed Parents had not properly cared for the children because they left them "overnight in inadequate housing with inadequate food and provisions thereby endanger-

---

1. Whether this is the correct standard or whether what we perceive to be a more rigorous burden of proof, "by clear weight of the evidence," applies is in some question. *Matter of A.D.W.* contains an excellent discussion of the confusion on this issue which it says was caused primarily by a footnote in *Matter of C.G.*, 1981 OK 131, 637 P.2d 66, which appears to have juxtaposed the *burden of proof* and the *standard of review* in such actions. To further confuse the issue, this writer also authored *Matter of L.C. and P. C.*, 1998 OK

CIV APP 96, 962 P.2d 29, incorrectly relying upon *Matter of J.M.*, 1993 OK CIV APP 121, 858 P.2d 118, (a termination case) for the conclusion that the "clear and convincing" burden of proof applied in deprived adjudications. Fortunately, that misstatement of the law had no impact on the ultimate result reached because the Court determined the evidence in the record on the deprived adjudication was sufficient even under that burden.

ing the children." In its appellate brief, the State refers to these actions as "abandonment," although it did not use that word in its allegations in the trial court and makes no effort to demonstrate that Parents' alleged acts meet any definition of that term under Oklahoma law. However, for want of a more precise term, we will use that characterization for purposes of discussing the evidence. Second, they claimed the children were deprived because one of the children, a nine year-old boy, "engaged in inappropriate sexual acts with his other siblings" and that "the mother knew of these acts and failed to protect." We must examine the evidence offered to support each of these allegations. We review that evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences from the evidence.

## ABANDONMENT

¶ 4 According to the testimony in this record, Parents took the children, then four to nine years of age, to an unoccupied house on a one and one-half mile dead-end road in rural Grady county near Bradley, Oklahoma, in the late morning or early afternoon of a day in late May. They left the children there with an adult daughter, Mary, because the children did not want to travel with them to Henryetta, where the family previously lived and Parents intended to see an attorney.[2] The children expressed a preference to stay in this rural setting and play. The record contains unrefuted testimony that Parents planned to return from Henryetta that evening.

¶ 5 Parents' pastor and landlord, Mr. Ayres, owned the house and was renovating it, with some assistance from Parents, so that Parents could move the family into the house from a smaller house Mr. Ayres owned in nearby Alex, Oklahoma. The house lacked running water, telephone service and electricity. The children had been to the house previously with Parents when they were assisting in renovation work. The record contains no evidence that the house was not

structurally sound, but there is evidence that the surrounding area contained piles of debris, some of which may have posed a danger to the children if they were allowed to play in it.

¶ 6 When they departed, Parents left an ice chest with food and beverages for Mary and the children. According to the testimony, there was sufficient food and beverage for lunch, supper and a little more. Mr. Ayres came to the house, along with his wife, daughter and son-in-law, in the early afternoon to work on it. He saw the children playing, eating, and drinking sodas, and he left after installing some electrical boxes.

¶ 7 Parents' car broke down on the way to Henryetta, and when night came, Mary put the children to bed on a sleeper sofa in the house, using blankets and pillows they had with them. When Mary and the children awoke in the early morning and the parents had not yet returned, they set out for the nearest neighbor's house, as they had been instructed by Parents if they needed any assistance. On their way there, they were seen by another neighbor, Mr. Anderson. He took the children to his home. He woke his wife, and Mary made telephone calls, trying to contact the sheriff and others, apparently concerned that Parents may have had an accident. Mary wrote a note to Parents to tell them where she and children were and asked Mr. Anderson to post the note on the gate back at the house on his way to work. He did so.

¶ 8 When the Andersons' children arose, Mrs. Anderson fed them, Mary, and the children breakfast. Mrs. Anderson offered baths and clean clothes to the children, who were dirty from playing outside the prior day. They bathed, changed into clean clothes, and went outside to play with the Anderson children. Mary made more telephone calls, and Mrs. Anderson then drove them back to the house. While they were there, Mr. Ayres, in response to a telephone call from Parents that morning, came to the house at about 10 a.m. and took the children and Mary to their home in Alex. While on the

---

2. We note that the State did not allege or argue at trial that Mary was an inappropriate caregiver and produced no evidence to suggest that the decision to leave the children with Mary, in and of itself, was inappropriate.

way to Alex, they saw an uncle and their grandmother pass by on their way to the house to pick up Mary and the children. Later that same day, DHS took the children into custody.

¶9 Parents do not deny that the children stayed overnight at the house near Bradley, but argue that the children were not thereby endangered or left with inadequate food and shelter. The State argues that the potential for danger was sufficient, in and of itself, to support the deprived adjudication on this ground. At least under the circumstances presented in this record, we disagree.

¶10 Parents must make reasonable efforts, but are not bound to absolutely foresee every emergency or protect their children from every calamity, *see, e.g. Matter of Christopher H.*, 1978 OK 50, 577 P.2d 1292. Here, because of an emergency which delayed the return of Parents, the children stayed overnight for a single night at a house with which they were familiar that was undergoing repairs, they had food and beverages, they were supervised by an adult, and, prior to any intervention by DHS, they were returned unharmed to their usual residence. As reflected by this record, these events, standing alone, do not present circumstances serious enough to warrant interference in an intact nuclear family. The record contains no competent evidence to support the trial court conclusion that the State had sustained its burden of proving that the children were left without adequate food and shelter, and that conclusion is reversed.

### FAILURE TO PROTECT FROM INAPPROPRIATE SEXUAL CONDUCT

¶11 According to the State, the children's mother knew that W.W., a son who was nine years old at the time the children were removed from the home, had engaged in inappropriate sexual conduct with A.C., a daughter who was six years old at the time

the children were removed from the home, and perhaps the other children. The exact nature of this sexual conduct was never clearly defined.[3] State argues that the mother's failure to protect A.C. and the other children from that conduct *after she knew about it* supports the finding that the children were deprived. However, the State directs us to no evidence in the record tending to prove either Mother's knowledge of this conduct or her failure to take appropriate steps after she learned about it. Our review of the record has yielded no such evidence.

¶12 The closest the State came to proving these two essential elements is testimony from A.C. in which she testified that she told her mother about one incident, despite having earlier testified that she did not tell her mother about this conduct. When she was asked what her mother did in response, she testified that W.W. "got in trouble."

¶13 The record contains no evidence indicating that the mother did nothing, as suggested by the State. Moreover, there is no evidence that the conduct occurred again after W.W. "got in trouble," except for the incident that occurred at the foster home *when the children were no longer in the care of their parents.* In short, this record contains no competent evidence from which a finder of fact might reasonably conclude that the mother both *knew or should have known* about W.W.'s alleged conduct and *failed to take reasonable steps to prevent that conduct in the future.* We must therefore reverse the trial court's conclusion that the State had sustained its burden of showing the children were deprived because Parents had failed to protect the children from inappropriate sexual conduct by W.W.[4]

### CONCLUSION

¶14 This record contains no competent evidence reasonably supporting the conclusion that the State sustained its burden of

---

3. The only incident about which there is any unambiguous evidence concerning what occurred happened after the children had been removed from the home and were in their foster parents' care.

4. Nothing we say here should be interpreted as suggesting that Parents' handling of this behavior, *now that it has come to light and reoccurred in foster care,* should not be monitored by appropriate agencies.

proving these children deprived. Accordingly, the trial court's order finding the children to be deprived is reversed.

REVERSED.

HANSEN, P.J., and MITCHELL, J., concur.